[Civil No. 3773. Filed March 29, 1937.]

[66 Pac. (2d) 246.]

CONSOLIDATED MOTORS, INC., a Corporation, Appellant, v. HOPE KETCHAM, Appellee.

296

Messrs. Chalmers & Fennemore, Mr. J. Early Craig, Mr. Virgil T. Bledsoe, for Appellant.

Messrs. Cox & Moore, for Appellee.

LOCKWOOD, J.—This is a suit by Hope Ketcham, hereinafter called plaintiff, against three defendants, Howard. W. Blaine, O. E. Baker, and Consolidated Motors, Inc., the latter being called the company, for damages for personal injuries alleged to have been

suffered by plaintiff in an automobile accident which occurred November 4, 1934. The situation which gave rise to the action may be stated as follows:

The company is engaged in the business of selling Ford automobiles at retail in Phoenix and vicinity, and Baker and Blaine were salesmen employed by it. Plaintiff claims she was injured by an automobile accident while she, together with several other persons, were riding in an automobile driven by defendant Blaine, the accident occurring some distance from Phoenix while the parties were returning from a dance at Rock Springs, some 40 miles from the former city. At the close of the evidence, the court granted an instructed verdict in favor of defendant Baker, and submitted the case as against Blaine and the company to the jury which returned a verdict in favor of the plaintiff and against the company and Blaine in the sum of $7,500. After the usual motion for new trial was overruled, this appeal was taken.

There are twelve assignments of error, which are grouped by the company under seven heads. We shall, however, not consider them in their order, but discuss first the effect of No. 7, which is that the court erred in failing to grant a new trial for the reason that the question of liability insurance had been improperly injected into the case. The situation upon which this objection is based is as follows: Defendant Blaine had been on the stand in his own behalf and testified quite fully as to what occurred on the night of the accident, and his reasons for believing that the injury of plaintiff, if she was suffering from any at all, was not caused by the accident. Counsel for plaintiff then commenced a cross-examination of the witness, which was at first apparently directed to an attempt to show that he was partially deranged mentally, and thereafter the following colloquy occurred:

"Q. . . . You made a statement after the 3rd of November about this, didn't you? A. I made statements before and statements after.

"Q. About this accident. You made a statement, a written statement, and signed it, about this accident, after the 3rd of November, didn't you?

"Mr. Wolpe: If the court please, at this time I want to object to that in so far as the defendant Baker is concerned. Any statement Mr. Blaine might have made is not binding on the defendant Baker.

"Mr. Craig: And we make the same objection on behalf of the Consolidated Motors.

"The Court: Go ahead. All right.

"A. I made a statement about this accident as all five of us did.

"Mr. Cox: Q. Where was that? A. I don't know.

"Q. Who did you make it to? A. A lawyer for the insurance company at that time, Charlie Young.

"Mr. Cox: We ask that we have that statement at this time.

"Mr. Craig: We have no such statement.

"Mr. Bledsoe: We were not in the case at that time.

"Mr. Craig: We are representing the Consolidated Motors here; we don't known anything about it.

"Mr. Cox: Q. Where was the statement the last time you saw it? A. At the time I made it, Charlie Young had it.

"Q. Now in this statement—

"Mr. Craig: If your Honor please, we are going to ask—there is no insurance company in this case, and we would ask that any reference to any insurance company be stricken.

"Mr. Cox: We object to counsel testifying about what there is. . . .

"Mr. Cox: Q. In this statement you made and signed, you said at that time—do you have it?

"Mr. Wolpe: I don't have it.

"Mr. Cox: Do you, Mr. Conway?

"Mr. Conway: I did not know there was any such statement.

"Mr. Cox: In that statement you made and signed, you said there was no whiskey at any time with the party that night, didn't you?"

It is the contention of the company that by this cross-examination plaintiff called to the attention of the jury that some, at least, of the defendants were protected by a public liability insurance company. The effect of bringing information of this nature to the attention of the jury in a personal injury action has been discussed by us in five different cases. The first was *Blue Bar Taxicab Co.* v. *Hudspeth*, 25 Ariz. 287, 216 Pac. 246, 249. The situation therein was as follows: One of the witnesses for defendant was asked a question in regard to the delivery of some bank checks, to which he replied: "One of them, the agent representing the insurance company, he made the one direct to the Arizona Hospital for $220." Defendant promptly moved to strike that portion of the answer in regard to the insurance company, which motion was resisted by plaintiff, and the same witness was questioned by counsel for plaintiff on the same subject during cross-examination. We said:

"The effect of these questions, together with the answer of the first question, made the fact known, and impressed upon the jury, that back of defendant's liability stood some sort of insurance. This information was not wholly inadvertent, so far as plaintiff was concerned, nor was it a necessary incident of any legitimate evidence. No instruction was given to the jury to cure the effect of it. The consequence of such information is well known, and is sufficient to require a new trial. It is useless for counsel to talk of the innocuous character of this evidence, when they at the same time, in order to get the information before the jury, are willing to imperil any verdict which might be rendered. All lawyers know the rule in regard to such evidence, and they must not expect the court to establish a rule, and then wink at its violation."

And the case was reversed. The same question arose in *Tom Reed Gold Mines Co.* v. *Morrison*, 26 Ariz. 281, 224 Pac. 822, 825. In that case several of

the jurors were questioned as to whether they carried public liability insurance, and were informed that the defendant corporation did carry it. We referred to the matter in the following language:

"The defendant's liability in no sense depended upon it, and the injurious effect knowledge of it by the jury was likely to have is so apparent that it is unnecessary to discuss it."

And we cited *Blue Bar Taxicab Co.* v. *Hudspeth, supra,* in support of the rule that erroneous reference to the insurance company required a reversal. The next time the matter arose was in *Arizona Cotton Oil Co.* v. *Thompson,* 30 Ariz. 204, 245 Pac. 673, 675. The defense had offered in evidence a statement signed by the plaintiff; the latter contended that it was signed under such circumstances that it was not a fair statement, and, being placed on the stand by the defendant was fully cross-examined concerning his making the statement. His own counsel then said:

" '2. No; just answer the question; did you prepare that statement and sign it? A. I did not.

" 'Q. Who prepared it, if you know? A. A gentleman who came out there and introduced himself as adjuster for the insurance company.' "

We said:

"We think this presents a very different situation from that in the Hudspeth Case, *supra.* Since defendant was relying upon and offering in evidence a statement which had been signed but not written by plaintiff, we think it was not error for plaintiff, in attempting to show that the statement was not a completely ingenuous one, to prove it was actually prepared by one who was very much interested in the result of the case. It also appears that the witness Reagan, when called by the defendant, testified, in answer to questions asked by defendant's counsel, to matters which would undoubtedly inform the jury that defendant was carrying liability insurance."

And we held that under these circumstances plaintiff was justified in his conduct. The question again arose in *Hatchimonji* v. *Homes,* 38 Ariz. 535, 3 Pac. (2d) 271, 272. A witness had testified in regard to a conversation with the defendant, and was asked by counsel for plaintiff whether she had told all that was said in the conversation about the accident, to which she answered: ''I believe I have, only that Mr. Hatchimonji said that he had gone to see the insurance company''— She was immediately interrupted by counsel for the plaintiff and stopped from going any further. We held that since the reference to insurance was inadvertent and was not brought out by direct questioning, and, further, that no motion was made to strike it, the error did not require reversal. The last time we considered the matter was in *Fike* v. *Grant,* 39 Ariz. 549, 8 Pac. (2d) 242, 243. The daughter of the plaintiff was on the stand and was asked by her attorney whether she had talked to anyone about the accident, when the following colloquy occurred:

''A. Would you like to know what I asked them?

''Q. You may tell all that was said. A. I went for the purpose of asking Mr. and Mrs. Fike—

''Q. Just a minute. Speak a little slower and talk to the jury. A. I went to the Fike's place of business to inquire about the insurance on their car and Mr. and Mrs. Fike—

''Q. Was that all you asked them? A. No.''

At the close of her testimony, defendants' counsel moved that a mistrial be declared on account that insurance had been brought into the case, which motion was denied, and the court, after directing the jury to disregard to the insurance company, instructed it as follows:

'' 'There was some evidence which was stricken out in this case as you probably recall, a statement made by Miss Helen Grant, the daughter of the plaintiff; it

was stricken out as a voluntary statement by her that she went down to talk to these people about their insurance. That is a question which never should be injected into a case of this kind. There is no evidence in this case that these defendants carried any insurance and that must be eliminated entirely by you in the consideration of this case. I think I may say if there was any insurance in the case it was not carried by these particular defendants so that should be entirely eliminated.' ''

The plaintiff contended that the statement of the witness Helen Grant was inadvertent and under the ruling in the Hatchimonji case did not constitute reversible error, and after referring to the Blue Bar Taxicab case, *supra,* we said:

''This language is applicable to the situation before us since the suggestion of insurance in this case came about in very much the same way it did in that one, but the effect of calling the jury's attention to the fact that the defendant carried liability insurance is so prejudicial to the rights of a defendant in such a proceeding that a fuller consideration of the proposition convinces us that the plaintiff should not be permitted to place this information before the jury and escape the consequences of his action upon the claim that it was inadvertent. To say that a witness for the plaintiff may call the attention of the jury to the fact that the defendant carries liability insurance in reply to a question of general nature, such, for instance, as the following: 'What else was said?' 'You may tell all that was said,' 'Relate the conversation between you,' or any question the answer to which might include the fact of insurance alone or along with others, and then permit the plaintiff to reap the benefits the disclosing of this information aids in bringing about is not in accord with our understanding of the term 'inadvertence' as used in this connection. It was, of course, not true in this case, as the high character of appellee's counsel at once testifies, but it is so easy in this way for one who is not scrupulous in the observance of the ethics of the profession to place such information before a jury intentionally and then claim inadver-

tence that it should not be permitted at all, unless it becomes necessary in explanation of facts brought out by the defendant on cross-examination, as was the case in *Arizona Cotton Oil Co.* v. *Thompson,* 30 Ariz. 204, 245 Pac. 673. But even then a witness may not take advantage of the situation and disclose such information voluntarily with the hope that it may be regarded as responsive. All lawyers are aware of the prejudicial effect of such testimony and counsel in practically every case of this character knows before going into the trial of any particular suit, or should know, if the owner of the car carries liability insurance, but whether he does or does not carry it to the knowledge of the plaintiff's attorney, the latter should instruct his witnesses not to mention it and inform them that to do so will render any judgment obtained by the plaintiff subject to attack upon that ground.''

■ It will be seen that the rule laid down by us is, that unless it appears that the plaintiff was entirely without blame in creating the situation which caused the reference to the question of insurance, we have always reversed the case whenever the matter was in any way brought to the attention of the jury, regardless of whether it came through a witness for plaintiff or defendant, or upon direct or cross-examination. It is not sufficient that plaintiff did not mean to bring out the prohibited matter, but he *must mean not to.*

■ It is evident from the cross-examination, which referred to a specific signed statement made at a certain time, that counsel for plaintiff had in mind one particular statement of which he had knowledge. We are of the opinion that since this must have been true, it was the duty of counsel, even if the statement itself might be admissible for any purpose, to so carefully guard the manner in which it was introduced as to, if possible, avoid any reference to the insurance company. This he might easily have done by issuing a *subpoena duces tecum* to the person to whom he knew it was made, and then, since it was a

signed and written statement, identifying it through the testimony of the defendant, and if it in any particular thereof was admissible, offering or using it in evidence. He chose not to do this, but went into the matter in such a manner that he should have known it was but natural for the question of insurance to come out during the cross-examination. And even when it was brought out, he did not, as did counsel in the Hatchimonji case, immediately stop the witness and desist from further questioning along this line, but when counsel for the company made the statement, "There is no insurance company in the case and we would ask that any reference to any insurance company be stricken," injected the remark, "We object to counsel testifying to what there is," and continued a cross-examination in regard to the statement. In view of what we have said as to the highly prejudicial effect of allowing a jury even to surmise from statements made during the trial that back of the nominal defendants there stands an insurance company, and the great care which a plaintiff must use to see that the matter does not come into the case through any fault of his, we are of the opinion that the case must be reversed for a new trial on this ground, regardless of the other assignments of error. It is unnecessary, therefore, strictly speaking, for us to consider the remaining assignments in order to determine the appeal. In view, however, of the fact that the error we have just passed on requires the remanding of the case for a new trial, and that many other questions have been raised on the appeal, which undoubtedly will require consideration by the trial court on the new trial, we discuss some of these other questions.

Plaintiff, in order to sustain her action against the company, invoked the doctrine of *respondeat superior* and the company contends that doctrine

does not apply as between Blaine and it, for the reason that it does not appear the relationship between them was that of master and servant. The general rule of *respondeat superior* may be stated as follows: (1) Except as to fellow servants, a master is subject to liability for injuries caused by the tortious conduct of servants, within the scope of their employment; (2) With certain exceptions not pertinent to this case, a master is not liable for the tortious conduct of servants acting outside of their scope of employment. Restatement, Agency, § 219. On the other hand, a principal is not responsible for physical harm caused by the negligent conduct of an agent who is not a servant, even though the latter is engaged in the performance of the principal's business, unless the act which caused the harm was done in a manner directed or authorized by the principal. Id., § 250. It then becomes important to ascertain whether one whose negligent act causes an injury and who is in the employ of another is the agent or the servant of the other, within the meaning of the rules above set forth. The general test as to whether an employee is also a servant, within the meaning of the rule, may be stated as follows:

"A servant is a person employed to perform service for another in his affairs and who, with respect to his physical conduct in the performance of the service, is subject to the other's control or right to control." Id., § 220.

■■ In determining whether one acting for another is a servant or an independent contractor, many matters of fact may be considered. Among those which are pertinent, under the evidence in the present case, are as follows:

"(a) the extent of control which, by the agreement, the master may exercise over the details of the work;"

"(c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;"

"(e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;"

"(g) the method of payment, whether by the time or by the job." Id., § 220.

But the ultimate fact, which these evidentiary facts are merely intended to assist the jury or court in determining, is whether the alleged servant is subject to the other's control or right to control in the manner in which he reaches the desired result. The distinction is well set forth as follows:

"It is important to distinguish between a servant and an agent who is not a servant, since ordinarily a principal is not liable for the incidental acts of negligence in the performance of duties committed by an agent who is not a servant (see § 250). One who is employed to make contracts may, however, be a servant. Thus, a shop girl or a traveling salesman may be a servant and cause the employer to be liable for negligent injuries to a customer or for negligent driving while traveling to visit prospective customers. The important distinction is between service in which the actor's physical activities and his time are surrendered to the control of the master, and service under an agreement to accomplish results or to use care and skill in accomplishing results. Those rendering service but retaining control over the manner of doing it are not servants. They may be agents, agreeing only to use care and skill to accomplish a result and subject to the fiduciary duties of loyalty and obedience to the wishes of the principal; or they may be persons employed to accomplish or to use care to accomplish physical results, without fiduciary obligations, as where a contractor is paid to build a house. An agent who is not subject to control as to the manner in which he performs the acts that constitute the execution of his agency is in a similar relation to the principal as to such conduct as one who agrees only to

accomplish mere physical results. For the purpose of determining liability, they are both 'independent contractors' and do not cause the person for whom the enterprise is undertaken to be responsible, under the rule stated in § 219." Id., § 220.

Let us then examine the record in the present case to ascertain whether it establishes what the relation existing between Blaine and the company was. The only evidence bearing on this point is the statements made by the president of the company and by the defendants Blaine and Baker when cross-examined under the statute. This testimony agrees in substance and may be stated as follows: Blaine and Baker were employed by the company as salesmen for the purpose of selling Ford automobiles. They were given a drawing account of $12.50 per week at the time of the accident, not as a matter of voluntary contract, but under the automobile code of the NRA (48 Stats. 195), which was then in force. This drawing account, however, was deducted from any commissions they might make through the sale of automobiles, these commissions being their sole compensation for their services. The salesmen necessarily required automobiles for the purpose of demonstrating the product of the company, and each one at the time of the accident was purchasing an automobile from the company on the installment plan, which was used as a demonstrator. The titles to these cars were in the name of the company and they bore license plates paid for by the company. At the time of the accident, the car driven by defendant Blaine was the one which was used by Baker as a demonstrator. The only direct testimony in regard to whether or not the company controlled the actions of its salesmen was that of Stafford, the president of the company, who said as follows:

"Q. To whom did you instruct them to sell? A. To anybody.

"Q. To anybody anywhere? A. Anywhere.

"Q. Any time? A. Yes, any time.

"Q. You, of course, directed how the sales were handled, did you? A. During working hours, yes sir.

"Q. Now, you could not fix out papers except during working hours? A. Yes sir.

"Q. Did you limit them to prospects, that they should not bother anybody except during working hours? A. Oh, no.

"Q. If they got a prospect out of a church, it was all right with you? A. It didn't make any difference.

"Q. If they got a prospect and a sale out of a pool hall, that was all right with you? A. Yes.

"Q. Anywhere? A. Anywhere.

"Q. Any time? A. Yes sir."

 . It will be seen that this evidence deals with three of the matters which we have stated above may be considered in determining the ultimate question of control. The first is, "(e) whether the employer or the workman supplies the instrumentalities, tools and the place of work for the person doing the work." The particular instrumentality in question is the car which is almost necessarily used for demonstration by an automobile salesman. The defendants' direct testimony was that the salesmen owned their demonstrator cars and were purchasing them on time payments. On the other hand, it appears that the title to the cars still remained in the company and that it purchased the license plates for them. We think on this evidence, it was for the jury to determine whether the cars were owned by the employer or the salesmen. But it should be remembered that the ownership of the cars was not the ultimate fact in question. Whichever way that question was determined by the jury, its only real value was in assisting the triers of fact to determine the ultimate question of control. We have held in the case of *Baker* v. *Maseeh,* 20 Ariz. 201, 179 Pac. 53, that when one is driving an automobile owned by another and through the negligent conduct

of the former, a third person is injured, the fact of ownership when proved is sufficient *prima facie* evidence that the driver was the servant of the owner, using the vehicle in the business of the owner. This, however, is rebuttable by the defendant owner upon his showing affirmatively that notwithstanding his ownership of the vehicle, the driver was not, in fact, his servant within the meaning of the rule of *respondeat superior*. For this reason, in cases of this nature it is extremely important that the court should clearly and correctly instruct the jury as to the law in regard to the situation. The average juror, who is not experienced in legal reasoning, might readily, without proper explanation and instruction from the court, assume that the mere fact that the ownership of the car is in A is conclusive evidence that B is the servant of A. This, as we have pointed out, is not true. The ownership of the car, even when established, is merely *prima facie* evidence of the relation between the parties and subject to be overcome by other evidence as to the ultimate fact.

The second point is "(g) the method of payment, whether by the time or by the job." It appears from the undisputed evidence that the salesmen were paid solely by the job, that is, a commission on each car sold. It is true that they were allowed a drawing account of $12.50 per week, but this was merely an advance upon prospective sales and was deducted from the commissions earned. This also is merely an evidentiary fact bearing upon the ultimate fact of control, and the jury should be properly instructed to that effect.

The third point is "(a) the extent of control which, by the agreement, the master may exercise over the details of the work." The only evidence on that point is contained in the statement of Stafford, who testified

as follows: "Q. You, of course, directed how the sales were handled, did you? A. During working hours, yes sir." If this testimony is to be believed, and that of course is a question for the jury, the company retained control of the direction of how the sales were to be handled during working hours, but did not attempt to retain any control on interviewing prospects after working hours, as is shown by the following question and answer: "Q. Did you limit them to prospects, that they should not bother anybody except during working hours? A. Oh, no." This is obviously not conclusive as to the extent of control, and the jury should also have been instructed that this is merely an evidentiary fact bearing on the ultimate fact of control during the trip when the accident occurred. There is nothing in the evidence which shows the usual custom in regard to automobile salesmen in the locality of Phoenix, whether their work is usually done under the direction of the employer or without supervision, although this would have been, if proved, a very material evidentiary fact to aid the jury in its consideration of the ultimate fact.

It appears from what we have said therefore, that the question of whether defendants Baker and Blaine were servants of the company was a question of fact to be decided by the jury under proper instructions from the court.

We have gone into the matter quite fully so that upon a new trial of the case, error will not occur in regard to this particular factor, necessitating, perhaps, another reversal of the case.

There is another factor of the case which merits discussion. A jury might perhaps be justified in finding from the foregoing evidence that the salesmen were at times under the control of the company in regard to their actions in the making of sales, and at other

times were not. In such a case it would be of importance to ascertain just when the control began and when it ceased, for of course the test is the right of control on the trip during which the accident occurred. It appears from the record that Baker and Blaine, hearing from a friend that she knew a person living in the Rock Springs district who might be persuaded to buy a car, decided to go to the dance that was held in that district the night of November 3d, for the combined purpose of investigating the prospect and enjoying the dance in company of several others, among whom was plaintiff. In doing so, Baker drove the car used by him as a demonstrator, to Rock Springs. Apparently the prospect whom they were seeking was not there, so the party remained until some time about midnight and then decided to return to Phoenix. Baker, for some reason, had become violently ill and was practically unconscious. At least he was in no condition to drive the car, so the remainder of the party, after discussing this situation, decided to remove the keys to the car from his person without his knowledge, and that Blaine should drive the car home. They started from Rock Springs some time in the night, and after they had gotten out a short distance, the car ran off the road and turned over completely, lighting again on all four wheels. Naturally all of the occupants were quite excited, and plaintiff indeed became hysterical for a time, but it appeared that none of them was then thought to be seriously injured, and the party continued into town, Blaine still driving the car under its own power. When plaintiff reached her home, she felt quite sore and bruised but did not then consider anything serious was the matter with her. Are these facts sufficient for the jury to draw the inference that at the time the trip was made by the party in question to Rock Springs that night,

Blaine was a servant of the company, acting within the scope of his employment? We have just held in the case of *Lee Moor Contracting Co.* v. *Blanton, ante,* p. 130, 65 Pac. (2d) 35, that one may be on the same day an employee, in the employ of one party, and at other times in the employ of another, although the ultimate purpose of his labors be the same, and we think it follows that a salesman may at times be a servant and at other times an independent contractor, although the ultimate purpose to be reached in both capacities is selling the product of the employer. We think it very doubtful whether the evidence would sustain the conclusion that a trip to a dance between the hours of 10 P. M. and 2 A. M., even though one of the purposes was to interview a possible prospective purchaser of an automobile would be, by the usual contract of employment of an automobile salesman, under the physical control of his employer as to the method and manner of dealing with a prospect, but assuming for the sake of the argument that such might be the fact, again it is necessary that the jury be carefully instructed upon this point.

In view of the fact that the case must be reversed on other grounds, it is not necessary for us to determine whether or not the instructions of the court complied with the rules we have set forth above, as on a second trial we are satisfied they will be most carefully adhered to.

The judgment of the superior court of Maricopa county is reversed and the case remanded for a new trial, in accordance with the views expressed above.

McALISTER, C. J., and ROSS, J., concur.