[Civil No. 4022.   Filed February 27, 1939.]

[87 Pac. (2d) 484.]

WESTERN TRUCK LINES, LTD., a Corporation, and BILL MOREY, Also Sometimes Known as and Called D. A. MOREY, Appellants, v. VIVIAN BERRY, Appellee.

Mr. Henderson Stockton, Mr. Eli Gorodezky, Mr. S. N. Karam and Mr. J. W. Cherry, Jr., for Appellants.

Mr. Albert W. Gurtler and Messrs. Laney & Laney, for Appellee.

LOCKWOOD, J.—Vivian Berry, hereinafter called plaintiff, brought suit against Western Truck Lines, Ltd., a corporation, hereinafter called defendant, and Bill Morey, also sometimes known as D. A. Morey, to recover damages for personal injuries which plaintiff alleged she had suffered as a result of the negligence of Morey. The case was tried to a jury which returned a verdict in favor of plaintiff in the sum of thirty-five hundred dollars, and this appeal was taken.

There are some thirty-one assignments of error, but we think we need consider only two. In order that these may be discussed properly, it is necessary that we make a brief statement of the situation as shown by the record. The complaint alleged, in substance, that on the 6th day of February, 1937, an automobile in which plaintiff was then riding collided with a motor truck owned by defendant and negligently driven by Morey; that as a result of such collision plaintiff was thrown out of the automobile and received certain personal injuries. These injuries were alleged to have been as follows:

(a) "Two of the plaintiff's ribs on her left side were fractured and broken; her right knee was sprained, contused and injured; her right shin and leg were bruised, contused and injured; her left leg was deeply pierced and cut by some sharp object; her left knee and ankle were bruised, contused, sprained and injured; her chest and neck were scratched, bruised and injured; her chin was cut and injured; she was caused to suffer a severe nervous shock, and to be sick, sore, lame, and disordered from the time of said motor vehicle collision until the present time; and was caused to incur expenses for surgical attendance, X-rays, and hospitalization in the amount, up to the date of filing this amended complaint, of $250.00."

(b) "That at the time when the plaintiff was so knocked out of the automobile in which she was riding, she was in ill and delicate health, she having suf-

fered a miscarriage about nine days theretofore; and although before said collision she had been rapidly recovering from her said illness, her being so violently hurled from said automobile and onto the pavement further injured her female organs and nervous system, seriously aggravated the conditions from which she had theretofore been suffering, and greatly retarded and hindered her recovery therefrom."

(c) "That the plaintiff's said injuries, and especially those to her ribs, chest, left knee and female organs, are lasting in character, and for a long time in the future the plaintiff will continue to be sick, sore, lame, and disordered as a result thereof and to incur further expenses for medical and surgical attendance,"

and damages in the sum of ten thousand dollars were asked. When the matter came on for trial, the jury was duly impaneled and sworn to try the case, whereupon a recess was taken. Thereafter counsel for defendant stated:

"If the court please, I observed with the plaintiff in this case inside the railing, two of the plaintiff's children a few years of age. The bringing of these children in this case into the court room, talking and jabbering as children will, we charge as misconduct on the part of counsel and on the part of the plaintiff. We ask at this time that those youngsters be excluded throughout the trial."

After some discussion the court said: "Mrs. Berry, do you think it is possible for you to find someone to take care of the children?" to which her counsel replied: "We will find someone to take care of them."

Court was convened again for the trial of the case about an hour and a half later, and counsel for the defendant asked that all witnesses be sworn and placed under the rule. The witnesses were called and sworn, among them being plaintiff and her mother. Thereafter counsel for the defendant stated that he had a matter to take up in the absence of the jury, and again

objected to the presence of the two children of the plaintiff. After some discussion as to what the facts were, the court made the following statement:

"I think the court can make a statement that will satisfy both counsel. Let the record show that after the impaneling of the trial jurors in this cause, a motion was made on behalf of the defendants that the two minor children of the plaintiff were then in the court room. That upon reconvening after the noon recess, the rule was invoked, whereupon, all witnesses subpoenaed or requested to attend the trial of this action, were called forward. That the two minor children of the plaintiff accompanied the mother (grandmother) up to the Clerk's desk where she was sworn, whereupon, she retired from without the court room, accompanied by the two children."

Counsel for defendant then moved for a mistrial on the ground that it was prejudicial error to have the children present before the jury at any stage during the trial of the case, and particularly after the proceedings following the adjournment first referred to. The court stated that it thought no harm had been done, and that the trial should proceed, whereupon counsel for defendant requested the jury be instructed properly relative to the matter, but the court declined to give any instructions, stating that if any harm had been done the record had already been made. The case then proceeded to trial and, among other witnesses, Dr. R. J. Stroud testified on behalf of plaintiff. He said that he first saw her on the 6th day of March, and after her description of the accident examined her as to the condition of her ribs and leg, and had her X-rayed; examined her again on the 10th, 16th and 30th days of March for the same condition. On the 15th day of April she again visited Dr. Stroud and complained of her menstrual condition, stating that nine days before the accident she had had a spon-

taneous miscarriage. Dr. Stroud then examined her but found no particular trouble with her female organs. On the 10th day of June he again examined her and came to the conclusion that she had perhaps a retained placenta and endometritis as a result of the miscarriage, and advised a curettement, which was done, a large amount of old placenta and clots in the uterus being removed. He was then asked the following question:

"Assuming that this lady was in a collision between a truck and an automobile in which she was thrown violently from the automobile onto the pavement on the 6th day of February and assuming the other facts you found, including the fact that she had had a miscarriage nine days before that, I will ask you whether there was any causal connection in your opinion between the accident and the conditions that she had, the illness that she had, what effect did the accident have, if any, upon her?" and answered thus: "That is about the hardest question I have ever been called on to answer in a case of this kind. May I state first it has been my own experience and the experience of others that any major accident to a woman ordinarily makes difference of menstrual function. The general rule is that they have a menstrual period coming on a little more quickly the first time and then perhaps some delays afterwards; that is just in general, but there is a difference that takes place in major accidents in women in which there is a nervous type of shock takes place. This is the first time I have seen an accident with this type of miscarriage coming on before the accident. One can take either premise on that, either that the effect of the accident was so to disturb the system that she did not complete the throwing off of the products of conception at that time or one might on the other hand say that an accident in that case may or may not have anything to do with it. One can take either premise. From her history and the fact that she continuously went down hill from the time of the accident until she was operated and the products of conception, the old products of conception

taken away from her, there is no doubt but what this woman lost ground because of her extreme nervous condition and from also some absorption from those products.''

There was further examination, and the doctor finally stated:

''Any major accident, without the factor of a miscarriage, has a definite effect on a nervous system, especially that of a woman. This girl, if you want to put it in terms which are understandable, was jittery, she was nervous at all times during all of my examinations; she was a nervous patient to question, a nervous patient to examine,''

and the trial proceeded. This was the only medical evidence in regard to any connection between plaintiff's female trouble and the accident, except that one of the medical experts for defendant stated, on cross-examination, that it was possible or perhaps even probable that an accident of the nature which it is admitted plaintiff suffered might perhaps retard her recovery from a miscarriage.

At the close of plaintiff's case, and again at the close of the entire case, counsel for defendant moved to withdraw from the consideration of the jury all of the issues in regard to injuries to her female organs, on the ground that there was no definite evidence to go to the jury that the accident had any effect in aggravating the condition brought about by the miscarriage. The motion was denied and the case was submitted to the jury as including the issue of whether a recovery from plaintiff's miscarriage had been retarded by the accident, although no special instructions in regard to this factor of the damages were given by the court.

The two errors assigned, which we consider, are whether the appearance of the two children of plaintiff before the jury when the witnesses were sworn

was such prejudicial error as to require a reversal of the case, and whether the court should have withdrawn from the consideration of the jury the issue of whether plaintiff's recovery from her miscarriage was retarded by reason of the accident. We consider these questions in their order.

■ ■ It is clear that the presence in the court room of children of a plaintiff of such tender age that they are unable to testify is entirely unnecessary from a legal standpoint. It is also a fact, natural and obvious, that the presence of such children, particularly in a case where the plaintiff is suing for damages for personal injuries, is bound to have the effect on the ordinary juror of causing him to sympathize with the plaintiff to such an extent that frequently his judgment, which should be based solely on the law and the facts legally relevant to the issues which he is to try, is greatly biased and influenced by the natural sympathy which every right-minded man has for infant children and, as a corollary thereof, for the injured parent. The effect is similar to that produced on a jury by the knowledge that the defendant in an action for personal injuries caused by an automobile accident carries insurance against such a contingency. The legal result of permitting knowledge of such insurance to be brought before a jury was first discussed by us in the case of *Blue Bar Taxicab & Transfer Co.* v. *Hudspeth*, 25 Ariz. 287, 296, 216 Pac. 246, 249, and we stated:

"The effect of these questions, together with the answer of the first question, made the fact known, and impressed upon the jury, that back of defendant's liability stood some sort of insurance. This information was not wholly inadvertent, so far as plaintiff was concerned, nor was it a necessary incident of any legitimate evidence. No instruction was given to the jury to cure the effect of it. The consequence of such

·information is well known, and is sufficient to require a new trial. It is useless for counsel to talk of the innocuous character of this evidence, when they at the same time, in order to get the information before the jury, are willing to imperil any verdict which might be rendered. All lawyers know the rule in regard to such evidence, and they must not expect the court to establish a rule, and then wink at its violation.''

The same question arose later in *Tom Reed Gold Mines Co.* v. *Morrison,* 26 Ariz. 281, 224 Pac. 822, and the case was reversed for a similar error. The matter again came up in *Fike* v. *Grant,* 39 Ariz. 549, 8 Pac. (2d) 242, and a similar action was taken. It was again assigned as error in the appeal of *Consolidated Motors, Inc.,* v. *Ketcham,* 49 Ariz. 295, 66 Pac. (2d) 246. After reviewing the cases just cited, together with *Arizona Cotton Oil Co.* v. *Thompson,* 30 Ariz. 204, 245 Pac. 673, and *Hatchimonji* v. *Homes,* 38 Ariz. 535, 3 Pac. (2d) 271, and pointing out the different situations in the two cases last cited, we said:

''It will be seen that the rule laid down by us is, that unless it appears that the plaintiff was entirely without blame in creating the situation which caused the reference to the question of insurance, we have always reversed the case whenever the matter was in any way brought to the attention of the jury, regardless of whether it came through a witness for plaintiff or defendant, or upon direct or cross-examination. It is not sufficient that plaintiff did not mean to bring out the prohibited matter, but he must mean not to.'' (49 Ariz. 295, 66 Pac. (2d) 249.)

We think this language is clearly applicable to the situation involved in the present case. Since this is the first time the specific question has been definitely brought before this court, if, after the first objection to the presence of the children, they had been carefully excluded from the court room by plaintiff, it might be that the case should not be reversed on this

ground alone.  But the matter had been called to the attention of counsel for the plaintiff both by opposing counsel and the court, and he knew, or should have known then, that it was his duty to see that the children were kept from the court room in the future. If, therefore, through any means or circumstances attributable to plaintiff and not contributed to by the defendant the children were permitted to re-enter the court room and to again exhibit themselves to the jury, we think it is inexcusable.  As was said in *Consolidated Motors, Inc., v. Ketcham, supra*:

" . . . In view of what we have said as to the highly prejudicial effect of allowing a jury even to surmise from statements made during the trial that back of the nominal defendants there stands an insurance company, and the great care which a plaintiff must use to see that the matter does not come into the case through any fault of his, we are of the opinion that the case must be reversed for a new trial on this ground, regardless of the other assignments of error. . . . "

We think it is necessary that the judgment be reversed on the foregoing ground.  Since it must be sent back for a new trial, we think we should also discuss the second assignment of error referred to.

■■   It is, of course, the rule that it is not sufficient in an action for damages based on negligence that plaintiff should show that a certain physical injury might have been caused by the negligence of defendant.  It is incumbent upon him to show that it has been so caused.  In the case of injuries of the nature complained of in section (b) of the complaint, it is obvious that the connection between cause and effect is something peculiarly and entirely within the knowledge of expert medical witnesses.  We think that the testimony as to whether any injury, both temporary or permanent, to plaintiff's female organs

was caused or aggravated by the accident is entirely too indefinite and uncertain to sustain a judgment for damages for that particular kind of injury. This being the case, we assume that on a retrial the court will see that the rule thus stated by us is properly applied.

The judgment of the superior court of Maricopa county is reversed, and the case remanded for a new trial in accordance with the principles set forth herein.

ROSS, C. J., and McALISTER, J., concur.