William J. FITZPATRICK, Respondent,

v.

ST. LOUIS–SAN FRANCISCO RAILWAY COMPANY, a Corporation, Appellant.

No. 46761.

Supreme Court of Missouri,

Division No. 2.

Sept. 14, 1959.

Motion for Rehearing or for Transfer to Court en Banc Denied Oct. 12, 1959.

James L. Homire, W. W. Dalton, Laurance M. Hyde, Jr., St. Louis, for (defendant) appellant.

Hullverson, Richardson, Hullverson & Jeans, St. Louis, for (plaintiff) respondent.

STORCKMAN, Presiding Judge.

In this action, brought under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., the jury awarded plaintiff $60,000 damages for the loss of an eye. By remittitur the recovery was reduced to $45,000 from which judgment the defendant has appealed. This is the second appeal in the case. The previous opinion is reported in Mo., 300 S.W.2d 490.

The defendant's first contention is that the trial court erred in refusing to enter judgment for the defendant in accordance with its motion at the close of all the evidence. The defendant urges that the record fails to show that the plaintiff was required to work under dangerous conditions and that plaintiff's own evidence unequivocally shows that the defendant exercised ordinary care for his protection. The theory on which the plaintiff submitted his case was that the defendant negligently failed to furnish him with goggles without cost to protect his eyes when, in the course of his duties, he put his head outside the car in order to look alongside the moving train, as a result of which particles of dirt and dust got into his right eye causing an ulcer and consequent herniation of the eyeball and loss of its fluid thereby necessitating removal of the eye. The issues of the present appeal do not require a statement of many facts involved in the first appeal.

The plaintiff, sixty-two years of age at the time of trial, was employed as a brakeman and baggageman by the defendant with which company he had thirty-eight years seniority. The evidence most favorable to the verdict tended to show that, among his many duties, the plaintiff assisted the conductor, the person in charge of the train, and was required to watch for train order signals and messages pertaining to the movement of the train. He also had to look out of the moving railroad cars while on curves for the purpose of detecting hot boxes, dragging brakes, or anything that might wreck the train. When necessary he would put his head out of a door of a coach or baggage car and look alongside the train.

On August 17, 1954, the plaintiff was on a run from Springfield, Missouri, to St.

Louis. The summer was hot and dry and dust conditions were severe. Around Milepost 69 there were a good many piles of fine chat used for ballast scattered between and alongside the tracks. They had been there about four months and the velocity of the passing train caused the dust to swirl up alongside and over the train. At the time in question it was necessary for him to look out at Milepost 69 for a train order signal at Milepost 68, one mile east. The train was running at sixty miles per hour and when he looked out to observe the position of the signal he "got a bad swirl of this dust" in his face and eyes; in his right eye he "got the heaviest charge." He was wearing glasses at the time. He went back in the coach, held his eye open and let the tears drain it out. It was "hurting pretty bad because something sharp had come in" his eye.

■ At Pacific, thirty-four miles from St. Louis, it was necessary for him to observe another train order signal. The dust conditions had also been very bad there for four months. When he looked out at the third crossing west of the passenger station he "got another charge of swirl" and again more in the right eye than in the left. Again he drained his eye, this time with the assistance of another trainman. The plaintiff was in St. Louis off duty from 8:10 a. m. until about 3:30 p. m.; he slept but did not go to the hospital maintained by the Frisco Employees Association in St. Louis. On the return trip plaintiff's eye became sensitive to light. When he arrived in Springfield that night he got a "hospital slip." The next day he went to Dr. W. J. Marshall in Springfield by whom he was treated. It was discovered that plaintiff had a corneal ulcer which developed rapidly causing a perforation and loss of the fluid. The eye was eviscerated on September 11, 1957. There was medical evidence from which the jury could find that the loss of the eye was caused by getting foreign particles in it at the times mentioned above.

The plaintiff testified that he complained to the train conductor, who was his superior officer, about the dust conditions on three occasions, the last time being about the middle of July. He asked the conductor for goggles about August 10. The conductor told the plaintiff he would take it up with the company and see if he could get them, but goggles were not furnished to him.

The defendant asserts in particular that the present record lacks evidence introduced at the previous trial with respect to the nature and extent of the alleged hazardous conditions under which the plaintiff was required to work. We find the evidence of the hazard to the eyes due to flying particles of dirt and dust was sufficient for submission of the more limited issue submitted at the second trial.

■ Further, the defendant asserts the record clearly demonstrates that the plaintiff had no duty to perform either on the straight track at Milepost 69, which was over a mile from the nearest signal, or at the third crossing west of Pacific from which no signal could be seen. The plaintiff testified that by reason of the speed of the train and other factors it was necessary for him to look out when he did. Whether it was necessary for him to look out as soon as he did was a jury question under the evidence and the instructions.

■ Finally the defendant contends that the plaintiff by his admissions "stated himself out of court insofar as contending that the failure to furnish goggles free constituted lack of ordinary care under the circumstances." The plaintiff testified that he had never worn goggles while he was in train service and that he had never seen any brakemen or conductors wear goggles. On the other hand, there was evidence that the defendant for twenty-two years had had goggles suitable for trainmen to wear which were for sale to their employees at factory cost; also, there was plaintiff's further testimony that he had

made a request for goggles about a week prior to the date of his injury. The testimony of plaintiff on which defendant relies was not conclusive that the exercise of ordinary care did not require the furnishing of goggles under the hazardous conditions which the evidence tended to prove existed at the time in question.

In view of the recent decisions of the Supreme Court of the United States which are binding on us, we cannot say as a matter of law that there was not a sufficient showing of negligence which contributed to the plaintiff's injury; hence, the trial court did not err in refusing to enter judgment for the defendant in accordance with its motion. Fitzpatrick v. St. Louis-San Francisco Ry. Co., Mo., 300 S.W.2d 490, 496 [7–9]; Wehrli v. Wabash R. Co., Mo., 315 S.W.2d 765, 769–772, certiorari denied 358 U.S. 932, 79 S.Ct. 321, 3 L.Ed.2d 304.

As one of its grounds for a new trial, the defendant urges that the trial court committed prejudicial error in refusing to declare a mistrial because a blind man, after "liaison" with plaintiff's counsel, was led into the courtroom during the trial.

The record shows that near the close of the evidence in defendant's case Frederick W. Minstermann, a blind man, carrying a white cane and a cigar box, entered the courtroom escorted by a guide furnished by the Blind Service. The blind man and his guide eventually took seats in a bench immediately behind the one in which plaintiff and plaintiff's wife and daughter were seated. With the court's permission, a picture of the group was taken by the defendant during a recess, a print of which was attached as an exhibit to defendant's motion for new trial. It is not clear from the record how long the blind man was in the courtroom. It appears that he remained for plaintiff's rebuttal evidence, but did not return for the jury argument later in the day.

After the close of all the evidence, the defendant, out of the hearing of the jury, moved for a mistrial which was denied.

The motion was presented and disposed of as follows:

"Mr. Dalton: * * * Now at this time, Your Honor, defendant moves for a mistrial of this cause and for reason therefor states the following:

"While the defendant was closing his case in this, a suit for $60,000.00 for alleged loss of an eye, there came into the courtroom, a blind man carrying a cane and being led by an elderly friend, that the blind man was led down immediately back of the family group referred to and called to the Court's attention yesterday, and there was seated. The defendant closed his case and came in the chambers. The defendant further shows to the Court that in the chambers this was mentioned to the judge and to Mr. Hullverson, and at that time Mr. Hullverson said that he had talked to the blind man that morning and that his appearance was pre-arranged, that he wanted to hear Mr. Hullverson argue his case, that the blind man was an old pal of his. Defendant respectfully shows to the Court this is highly prejudicial. It's a matter which Mr. Hullverson has pre-arranged as he said by telephone. I want to further move for an additional reason, immediately after this, the Court recessed to take this and after we had discussed the instructions, Mr. Hullverson went out into the hall and talked to the blind man who addressed him friendly as 'Everett,' and he was instructed at that time to report back here in the courtroom when the case is argued. This is highly prejudicial and the damage has been done and the damage was done by plaintiff's counsel, and I move that a mistrial be declared and this jury discharged.

"Mr. Hullverson: Now there is very little truth in the statements made by counsel. It is very ridiculous. It is so ridiculous that it doesn't rise to the height of respectable nonsense. How can a blind man prejudice anybody? This is an open and public courtroom, but so there will be no question about it, let's just discuss what happened. This man, as I told the Court,

I didn't know counsel was going to make a point of it or I wouldn't have said anything about it. The blind man is an old client to me. He comes to see me frequently every two or three weeks. He has studied law himself. He is interested in the law. He called me up this morning, wanted to talk to me. I said, 'Fred, I haven't got time. I have got to get up to court.' He said, 'What court are you trying the case in; maybe I can talk to you there.' I said, 'I'm in Judge McMillian's court.' He came up and sat behind the plaintiff three or four or five rows behind. I did not tell him to come back at two o'clock. I don't know if he's here. I don't know. It makes no difference to me if he's here or not. How in the world that can affect the defendant in this case is beyond me. I think it's nonsense, the whole thing.

"Mr. Dalton: With Your Honor's permission, during recess we took pictures, a picture was taken in the courtroom of this gentleman. What is his name, Mr. Hullverson?

"Mr. Hullverson: None of your business.

"Mr. Dalton: What is the name of his friend?

"Mr. Hullverson: None of your business. I wouldn't dignify it by answering your question. That's completely silly, this whole thing.

"The Court: Motion for mistrial will be denied."

In opposition to the defendant's motion for new trial, the plaintiff filed an affidavit, executed by Mr. Minstermann, which stated that he had known plaintiff's counsel since about 1940, when Mr. Hullverson represented him in a lawsuit and he had been to Mr. Hullverson's office to visit and get advice from time to time since then. The affiant further stated that he is blind and draws a blind pension; that on November 6, 1957, at about 9:00 a. m. he called Mr. Hullverson to make an appointment and Mr. Hullverson told him he was trying a lawsuit in Judge McMillian's Courtroom No. 6; that the affiant studied law before his eyesight failed and was familiar with the Civil Courts Building and went there frequently to hear Mr. Hullverson and other lawyers argue cases; that he told Mr. Hullverson he "probably would be up to hear the argument." The remainder of Mr. Minstermann's affidavit, omitting nonessentials and matters already mentioned, states:

"Mr. Hullverson then told me that if I did go up there he would probably be able to talk to me during a recess.

"I came up to the courtroom escorted by a man who was furnished me by the Blind Service. I do not know his name. When I came into the courtroom I could hear Mr. Hullverson questioning a witness. I sat in one of the benches near the back of the courtroom and the man who brought me up to the courtroom sat beside me.

\* \* \* \* \* \*

"I was in the courtroom about five minutes when the Court declared a recess and then the jury went out. I think about that time I moved up towards the front. I do not know the man whose case was being tried and never met him that day or any other time. The reason I moved up was because I wanted to get a little closer so I could hear a little bit better.

"Some time after a recess was declared, then Mr. Hullverson came to me and said 'Fred, we are not going to argue the case this morning, we will probably argue it this afternoon and if you want to you can come back then.' Then I said, 'all right, I will.' That is about the only conversation I can remember, although we may have talked about other things.

"About that time I left and the man with me escorted me and took me up to 15th and St. Louis Avenue to the bank. I had other things to do and did not come back to Court.

"At no time did Mr. Hullverson ask me to come into this courtroom. I came in there of my own accord and without any-

body requesting me to do so. I do not wear glasses but I did have a white cane with me on this occasion and a cigar box which was kept closed.

"I was in this courtroom in the presence of the Court and the jury not more than five minutes. After the jury were excused a man came up to me and said 'Did Everett tell you to come up?'. I replied 'No', and he then said 'that's interesting'. I did not know who this man was but I asked somebody afterwards and they told me it was Mr. Dalton, attorney for a railroad. I did not even know this was a railroad case at the time because I had not heard enough of the evidence.

\* \* \* \* \* \*

"I had no idea that my walking into the courtroom would cause any commotion and I am very sorry if I did cause any commotion or misunderstanding.

"This was read to me by Mr. Hullverson's Secretary and it is true."

Also in opposition to the motion for new trial, the plaintiff filed eleven sets of interrogatories submitted to the members of the jury and the answers. One of the jurors refused to answer the questionnaire. By their answers, six of the jurors admitted seeing the man come into the courtroom and sit behind the plaintiff. Five noticed that he was blind and another did not see him enter but saw him seated behind the plaintiff and was not certain that he was blind. The jurors who answered the remaining questions stated in substance that they attached no importance to the blind man's presence; that the incident had nothing to do with the verdict; that it was not discussed during the jury's deliberations; and that the jury's decision was based on the law and the evidence.

In a memorandum filed at the time of overruling defendant's motion for new trial, the trial court stated at length its observations and conclusions with reference to the assignment of error based on the blind man's presence in the courtroom and the al-legation that the verdict was excessive. The trial court's theory was that if the blind man was brought into the courtroom intentionally for the purpose of currying favor with the jury, or if the jury was actually influenced in their decision, even though inadvertently, the defendant would be entitled to a new trial. The court concluded that the episode was not wilfully contrived and that the presence of the blind man did not influence the jury in its decision.

The plaintiff asserts that the presence of Mr. Minstermann could not possibly have increased sympathy for the plaintiff or prejudiced the defendant. It requires no imagination to immediately think of several ways this may have occurred. In his argument to the jury plaintiff's counsel stated: "It must be terrible to contemplate what it means going through life for any man with one eye knowing all the time something else may happen to his other eye, that he may lose it." The plaintiff had testified that he had been dismissed from his employment by the railroad after the loss of his eye; that he had not earned any wages since that time. He testified in considerable detail with respect to his unsuccessful efforts to find employment, including application to a state agency. In these circumstances the presence of Mr. Minstermann might reasonably suggest to the members of the jury that plaintiff, too, might be reduced to the unfortunate situation of having to earn his living by selling notions from a cigar box on the public streets. Then, too, the jury could not help but wonder who the blind man was seated behind the plaintiff and his family and what his connection was or had been with the plaintiff or the defendant. They might have wondered whether this man had lost his eyesight in the employment of the defendant or some other industry, but had been unable to recover damages, and it was therefore necessary for him to carry a white cane and the cigar box which is the trademark of the sidewalk vender. These and other emotional reactions may have been caused by the spectacle of the blind man. There is an old proverb that: "A

picture is worth more than ten thousand words."

The trial court in its memorandum recognized the gravity of the situation if the presence of the blind man had been intentionally procured, saying that "such histrionics" would be an affront to the court as well as grounds for a new trial. In our view of the matter the courts cannot permit the verdict to stand and thereby give tacit approval to the occurrence even though it was inadvertently or thoughtlessly permitted to happen. The relationship between Mr. Minstermann and plaintiff's counsel appeared to be such that a suggestion from counsel would probably have kept the blind man out of the courtroom. If not, the court could certainly have done so on being advised by plaintiff's counsel.

◼ The courts have an inherent power and duty "to regulate the admission of the public to the courtroom while a trial is in progress so that their presence shall not interfere with the administration of justice," 88 C.J.S. Trial § 38, p. 98, and "to see that justice is not obstructed by any person or persons whatsoever." 53 Am.Jur. 55, Trial § 42; 14 Am.Jur. 275, Courts § 43. It is not a complete answer for counsel to say as he did in argument on the motion to discharge the jury that "this is an open and public courtroom."

◼ In order to warrant a new trial it is not necessary that an episode such as this be deliberately contrived for the purpose of creating sympathy for the plaintiff or prejudice towards the defendant, nor is it necessary that it be conclusively shown that members of the jury were actually influenced for that would seldom be possible. The arousing of sympathy or prejudice is often so subtle that the person affected is the last to become aware of it or admit its existence. Otherwise, the reaction of the average person would be resentment. It is for the court and not the jurors to say whether they are likely to have been influenced by such an occurrence.

"In the trial of a cause in a court of justice not only should influences that actually work evil be guarded against, but also acts that have the appearance of evil, and these the trial judge has authority to forbid. Not only should courts rightly decide causes, but the trials should be conducted in such a manner that suspicion of wrong will not arise. Confidence in the integrity of the courts is absolutely essential to the maintaining of the state government." Benjamin v. Metropolitan St. R. Co., 245 Mo. 598, 151 S.W. 91, 97-98. In the Benjamin case a new trial was granted because several of the jurors and the defendant's claim agent had associated during the trial although the meeting was accidental and no actual misconduct was shown.

◼ In personal injury actions exhibits or demonstrations not relevant or competent on any issue which are likely to arouse sympathy for the plaintiff or antipathy for the defendant are improper and should be avoided. Taylor v. Kansas City Southern Ry. Co., 364 Mo. 693, 266 S.W.2d 732, 736 [4]; O'Hara v. Lamb Construction Co., Mo.App., 197 S.W. 163, 165; Texas & New Orleans R. Co. v. Underhill, 5 Cir., 234 F.2d 620, 624 [6]; Ullom v. Griffith, Mo.App., 263 S.W. 876, 880 [5]; Stutz v. Milligan, Mo.App., 223 S.W. 128, 129 [3]. See also Koeppel v. Koeppel, Mo.App., 208 S.W.2d 929, 933 [1]; Petty v. Kansas City Public Service Co., 355 Mo. 824, 198 S.W.2d 684, 689; Western Truck Lines v. Berry, 53 Ariz. 216, 87 P.2d 484; 88 C.J.S. Trial § 39, p. 98.

◼ Trial by juries ought to be conducted with dignity and in such manner to bring about a verdict based solely upon the law and the facts, and there should not be injected into the case any extrinsic matter that tends to create bias or prejudice. Critcher v. Rudy Fick, Inc., Mo., 315 S.W. 2d 421, 427 [2-4].

◼ The trial court mentioned in its memorandum that no evidence was offered in support of the motion for new trial, and

the respondent stresses this fact on appeal. After the trial, the evidence of jurors could not be used to impeach the verdict. Lloyd v. St. Louis Public Service Co., 360 Mo. 91, 227 S.W.2d 460, 461 [1]; Brady v. St. Louis Public Service Co., 361 Mo. 148, 233 S.W.2d 841. If additional evidence were needed, it could and should have been obtained at the time of the occurrence and when it was first called to the court's attention. Not only could the facts have been developed better then than after the verdict, but the jury could have been interrogated more effectively, if that course was indicated, and appropriate action taken; however, the court took no action other than denying the motion for mistrial.

The need of a court's acting promptly and effectively in such a situation has been repeatedly emphasized. See 39 Am.Jur. 108, New Trial § 94, wherein it is stated: "Misconduct on the part of a third person, whether an agent, employee, or interested friend of the prevailing party, or of some officious third person, calculated to influence the jury, is a proper ground for a new trial unless by reason of appropriate steps taken by the trial court to cure the error, or otherwise, it appears that no prejudice in fact resulted."

■ Where the trial court has refused to grant a new trial on account of alleged misconduct, the revision of the appellate court will be exercised more freely than where a new trial has been granted. Ullom v. Griffith, Mo.App., 263 S.W. 876, 880 [7]; Girratono v. Kansas City Public Service Co., Mo., 272 S.W.2d 278, 281 [3]; James v. La Mear, Mo., 194 S.W.2d 915, 919 [1].

■ Misconduct which is *calculated* to create sympathy or prejudice and *may* have done so justifies the grant of a new trial. Kickham v. Carter, Mo., 314 S.W.2d 902, 908. It may well be that the jury would have reached the same result without the presence of the blind man, but the courts, as well as the parties, are entitled to have trials conducted without the taint of improper influence. Benjamin v. Metropolitan St. R. Co., supra. The trial court erred in failing to grant a new trial on this specification of defendant's motion.

Defendant also assigns error in that Instruction No. 2 was not supported by the evidence and was inconsistent with plaintiff's own testimony. What we have said in connection with the sufficiency of the evidence indicates our feeling on that score. Other assignments of error relating to allegedly prejudicial jury argument and excessiveness of the judgment need not be decided since they are not likely to arise in the same manner on retrial. However, counsel should carefully consider the merits of the complaints made.

For the error noted the judgment is reversed and the cause remanded.

EAGER, J., and BROADDUS, Special Judge, concur.