276 P.2d 536

Edna Lorraine WATSON, a Widow, in the Matter of Morris Miller Watson, Deceased, Petitioner,

v.

SAM KNIGHT MINING LEASE, Inc., Defendant Employer, and the Industrial Commission of Arizona, Defendant Insurance Carrier, Respondents.

No. 5896.

Supreme Court of Arizona.

Nov. 15, 1954.

J. Hubert Smith, Phoenix, for petitioner.

Donald J. Morgan, Phoenix, for respondent, The Industrial Commission of Arizona.

John R. Franks, Robert E. Yount and Robert K. Park, Phoenix, of counsel.

LA PRADE, Justice.

Certiorari to the Arizona Industrial Commission.

By this proceeding we are asked to review an award of the Commission denying petitioner's claim for death benefits provided in the Workmen's Compensation Act. A.C.A.1939, § 56–901 et seq. The Commission, by its award, found that the deceased husband and employee had died July 1, 1953, "as a result of acute heart failure due to heat exhaustion"—"not the result of an injury by accident arising out of and in the course of his employment."

The facts leading up to the death show that the decedent had been in his then employment several years as an employee above ground around the mine workings and mill at Winkleman, Arizona. During the forenoon of the day preceding death the decedent had worked in the mill crusher section. The day was referred to as very hot, 109°–110°, with very little humidity. After lunch Mr. Watson was told to get some sand and cement for a repair job in the mill. The sand was loaded by shovel from a hillside some 400 feet from the mill, by another employee. Watson acted in the capacity of truck driver—while sand was being loaded Watson made numerous trips to a water bucket located inside the ma-

chine shop, a few feet distant. It appeared to one witness that the decedent was drinking an inordinate amount of water, although Watson did not disclose to anyone that he was not well, nor did his condition reveal itself to anyone present. On bringing the sand, gravel and cement the decedent mixed a 5-gallon can of dry sand and cement, out in the open. The mix was completed inside the mill by the addition of water without the aid of decedent. When the mixture was completed decedent grouted in three or four piers under some "I" beams located inside the mill building. At 4 o'clock (end of shift) deceased left for home. The employer reported that both he and Watson were sweating freely at the time the work was performed. On arrival at home Watson told his wife that the heat off the sand and cement had made him deathly sick. He immediately drank a glass of cold water, some lemonade and divided a can of cold beer with his wife. In addition he drank a glass of Alka Seltzer and later tried to drink some ginger ale. Throughout the evening and night he was in great pain, very restless, and continually wanting water which he could not keep down. A doctor was called but did not come although he prescribed some capsules which were taken and vomited up. With each seizure of pain he experienced cold sweats. Early next morning he was removed to the hospital at Globe, Arizona, a distance of sixty-three miles. On arrival at the hospital he was unconscious and in a state of shock "apparently from congestive heart failure." The attending physician could not feel or count his pulse or hear his heart through the stethoscope due to so much noise from his breathing. He did not respond to oxygen and heart stimulants and died approximately one hour and forty-five minutes after arrival at the hospital. The doctor's death certificate (printed form) report in part read:

"Medical Certification

|  |  | Interval between onset and death |
|---|---|---|
| 1. Disease or Conditions Directly Leading to Death | (A) Pulmonary edema | About 6 hrs. |
| Antecedent Causes | Due To | |
| Morbid conditions if any giving rise to the above cause, stating the underlying cause last. | (B) Acute Heart Failure | " " " |
| | (C) Heat Exhaustion | 18 hours." |

(The answers A-B-C were in doctor's handwriting.)

At a hearing conducted by the Commis-sion the doctor testified in part as follows:

"Q. Do you have any opinion as to the exact cause of death from your ex-amination and treatment? A. The cause was heart failure with pulmonary edema.

"Q. Did you come to any conclu-sions as to the cause of death other than it was heart trouble complicated by the pulmonary edema? A. Did I come to any conclusions?

"Q. Yes, sir. A. "Not positive, no. I couldn't say positively what— she gave that history. It is possible that it had something to do with it; it is also possible that the treatment he administered had something to do with his condition getting worse.

"Q. You mean the hot bath and pills? A. Yes, ice water and beer and hot bath.

"Q. Would that tend to aggravate a heart condition in your opinion? A. The condition from heat exhaustion, yes.

"Q. Doctor, you did, I believe, as the attending physician, you prepared and signed the certificate of death, did you not? A. I must have signed the certificate of death, yes, sir.

"Q. And whatever is registered thereon is the conclusion ultimately at which you arrived as a result of the entire— A. It is possible sometimes that there are contributory causes. They are not positive diagnoses, no.

"Q. I know, but so far as you could arrive, or did arrive at an opinion that is your opinion as there given, is that right? A. Well, I wouldn't say all of it because I don't remember what is on there. I haven't seen the certificate or a copy of it since I signed it."

"Mr. Smith.

"I am not too concerned, doctor, with the question. I am concerned with what you wrote in giving the cause of death and if you desire to add there-to as you have indicated. A. You are referring to this heat exhaustion?

"Q. That is right. A. I couldn't make any positive diagnosis of heat exhaustion not having seen the patient before. He was in extreme shock. I couldn't say the heart condition was produced by that. That should be just a possibility. It is possible that has something to do with it, but I couldn't say that as a definite diagnosis not hav-ing seen the patient over an hour and a half and he was supposed to have had this exhaustion or this exposure the day before. It is purely history and purely speculation.

"Q. Assuming that to be the fact as you have had it given to you, could it be that the result you found would be the effect to come from that? A. It is possible, yes; it is possible. What I am saying—I am not saying that it

wasn't the cause of it, but I am not saying that it was the cause. Because I have no way of knowing; only as just hearsay.

"Q. In other words, you had to base your judgment upon what was presented to you and you did not have personal contact with the facts of that case? A. No. That is not the only cause of such conditions.

"Q. You used a word in there, doctor, edema. That is the word you used? A. Edema, yes.

"Q. That is the filling of the lungs with water and fluid? A. Yes.

"Q. And that condition is due—A. It is due to passive congestion of the heart. The heart isn't pumping the blood fast enough, the lungs fill up with the blood and fluid.

"Q. It amounts almost to a drowning condition, does it not, doctor? A. Yes.

"Q. Then you feel that the facts that have been made available to you and what you have stated here—you now have stated as fully as you can as to this matter which we are now discussing, the matter of the death certificate? A. Yes. I wouldn't want to say that heat exhaustion was the cause; it should be in there as possible cause.

"Q. But as you have stated that could be the base of the situation? A. It could be."

On coming out of the bathroom after the bath Mr. Watson told his wife that he was experiencing the same stomach pains that he had suffered some years previously when he suffered from kidney and prostate trouble. Referring to this illness Mrs. Watson testified that he had had a nervous collapse that for a considerable time left his lower legs paralyzed. She further testified that it was later discovered that Mr. Watson had a mass in his lower intestine that was successfully treated by X-rays, that he had recovered the use of his legs and had successfully passed physical examinations for his present employment.

Mr. Knight, in the employer's second report of injury to the Commission, said:

"No. 23. Describe in full how injury occurred (printed matter)

" 'The examining physician will have to give you information re cause of death. Employee probably became overheated during the hot day before he died but its bearing upon his death is beyond our knowledge.' "

■ The résumé of the facts and circumstances attendant on the last day of employment, together with the extreme sickness with which Watson was stricken on arriving at his home, convinces us the Commission finding that the employee died

"* * * as a result of acute heart failure *due to heat exhaustion*" (Emphasis supplied)

was amply warranted. But is there any warrant for the additional finding

"That the disability from which Morris Miller Watson died was *not* the result of an injury by accident arising out of and in the course of his employment." (Emphasis supplied)

▆▆▆ By this last phrase it is meant to convey the idea that the heat exhaustion and resultant death were not connected with the employment—not attributable in any manner thereto. The heat exhaustion had its genesis in the last day worked. The drinking of excessive amounts of water on the job, when connected with successive events, is indicative of the fact that heat exhaustion was about to take its toll, without its being known or realized. Within one hour after quitting he was deathly sick and succumbed within seventeen hours. Any reasonable analysis of the record convinces that exhaustion induced by work and climatic conditions had enveloped the deceased right on the job. Within one hour after returning home the wife was frantically beseeching the employer to secure the attendance of a doctor. In our case of Vukovich v. Industrial Commission, 1953, 76 Ariz. 187, 261 P.2d 1000, we recognized that it is currently understood that heat stroke, sun stroke, heat exhaustion or heat prostration induced by the usual conditions of employment are accidents within the contemplation of work-

men's compensation acts, where the usual conditions of employment subject the employee to a risk beyond the risk to which the general public is exposed from climatic conditions in that locality. When such an accident (heat prostration) occurs, resulting in disablement or death, compensation is rightfully due. In this Vukovich case we quoted approvingly from the statement of the rule applicable in this kind of a case as set forth in the syllabus of the reported case of L. C. Kimsey Heating & Plumbing Co. v. House, 1931, 152 Okl. 200, 4 P.2d 59. It is there said:

"If the place of the employee's work, by reason of its location, nature, and climatic condition, would likely expose him to the danger of heat exhaustion, overheating, or heat exertion, or if the risk of injury by heat exhaustion, overheating, or heat exertion is naturally connected with and reasonably incidental to his employment, as distinguished from the ordinary risk to which the general public is exposed from climatic conditions, the employer will be liable for the consequential injury."

In our case of Jones v. Industrial Commission, 1950, 70 Ariz. 145, 217 P.2d 589, in considering an injury resulting from exposure to cold water we announced as the applicable rule that for an injured employee to be entitled to compensation for

injuries received from overexposure to cold, that it must appear that the exposure was more severe or in excess of that to which other employees in the same employment were exposed. This statement of the rule to be applied in injuries resulting from overexposure to heat or frost bite or freezing, is not in conformity with the rule we announced in the Vukovich case and should have been recognized. Accordingly we now disapprove and renounce the rule of the Jones case. If it is shown that the conditions of employment result in subjecting an employee to exposure to heat or cold in excess of that of the general public in the same vicinity, and he is injured thereby, the injury is compensable.

Our detached observation leaves us groping for any substance upon which to fix the finding that the heat exhaustion was *not* work-connected, under conditions materially different than those under which the general public lived in that vicinity. That the deceased died from heat exhaustion is all too apparent and has been affirmatively so found by the Commission. If there is any inference that it arose *after* and independently of the employment we are not able to discern the antecedents for any such inference.

The award of the Industrial Commission is set aside.

PHELPS, C. J., and STANFORD, UDALL and WINDES, JJ., concur.