**277 P.2d 745**

PHOENIX BAKERY, Incorporated, defendant employer, Petitioner,

v.

The INDUSTRIAL COMMISSION OF ARIZONA; B. F. Hill, F. A. Nathan, and A. R. Kleindienst, as members of The Industrial Commission of Arizona, and Mary Marguerite Gustin, Respondents.

No. 5934.

Supreme Court of Arizona.
Dec. 14, 1954.

Snell & Wilmer, Perry M. Ling, Phoenix, for petitioner.

John R. Franks, Phoenix, for respondent, The Industrial Commission of Arizona, (Donald J. Morgan, and Robert K. Park, Phoenix, of counsel).

PHELPS, Chief Justice.

Petitioner, employer-defendant, seeks by way of certiorari to have this court set aside an award of the Industrial Commission made on the 30th day of April, 1954, denying petitioner's application for a rehearing and affirming its amended findings and award made and entered in said proceeding on March 29, 1954, in which it found that decedent George Gustin, husband of claimant, suffered an injury on

June 11, 1953, by accident arising out of and in the course of his employment from which he died the same day and awarding claimant compensation therefor.

The facts will be more fully developed hereafter in this opinion as it will be necessary to analyze the evidence in the case in determining whether the findings and award of the commission can be sustained.

 Petitioner has presented no assignments of error but bases its claim upon three propositions of law, first, that routine exertion in the course of employment does not constitute accidental injury; second, that death from heart condition is not compensable under our compensation act unless it is proved that it was precipitated by some accidental injury as its proximate cause; and third, that the findings of the Industrial Commission are to be given the same consideration as those of a jury or a trial judge, and when there is reasonable evidence to support an award or reasonable men might draw either of two inferences from the fact, the commission's findings must be sustained.

We agree with propositions of law Nos. 2 and 3 and with some reservations, accept proposition of law No. 1 as fairly stating the law. It cannot be said, however, to apply in every case. For example, in Vukovich v. Industrial Commission, 76 Ariz. 187, 261 P.2d 1000, 1002, we quoted with approval from Bollinger v. Wagaraw Building Supply Co., 122 N.J.L. 512, 520, 6 A.2d 396, 401, the following:

"'* * * The requirement that the injury or death arise by accident, under our statute, is satisfied if the client discharged the burden of proving that the condition complained of, i. e., the injury or death, is related to or affected by the employment, that is to say, if but for the employment it would not have occurred.'"

The Vukovich case involved a claim for compensation for the death of decedent resulting from a heat stroke and we held in that case that a heat stroke was caused by an accident which arose out of and in the course of employment of decedent; that the decedent in unloading lumber from a truck was more exposed to injury by heat stroke than others in the locale. We expressly held that the injury arose by accident arising out of and in the course of his employment. This view on that subject is supported in many jurisdictions. In Alexander Orr, Jr., Inc., v. Florida Industrial Commission, 129 Fla. 369, 176 So. 172, 173, the court said:

"'If the heat exhaustion arose out of the employment, as well as in its course, we think it is clear that any harmful effect upon the physical structure of the body of the employee, which was a proximate result of it, is an accident under our statute.'"

An examination of the New Jersey and Florida statutes indicate that they are es-

sentially the same as our section 56–931, A.C.A.1939.

The rule laid down in In re Mitchell, 61 Ariz. 436, 150 P.2d 355, in which the decedent met his death by inhaling carbon tetrachloride as it evaporated from use in cleaning contacts or terminals in switchboard relays of the Mountain States Telephone and Telegraph Company by whom he was employed, occurred when he was engaged in the routine performance of his duties as such employee. We held in that case that the injury was the result of an accident arising out of and in the course of his employment.

As we understand the position of petitioner in the instant case it is claimed that although the injury arose during the course of his employment it neither arose out of his employment nor occurred by reason of an accident. We are inclined to the view that petitioner has not given due weight to the testimony of a number of witnesses including that of Dr. Maurice Rosenthal, several employees of petitioner, and Judge Al Flood of West Phoenix Precinct Justice Court and ex officio coroner.

A post mortem examination was performed by Dr. Daniel Condon on June 12, 1953, and witnessed by Dr. Rosenthal, a report of which was made by Dr. Rosenthal on June 22, 1953, and filed with the Industrial Commission on July 6 following. According to this report the internal examination of decedent disclosed a congestion and pulmonary edema of the lungs associated with an enlarged heart weighing twice the normal weight and the coronary arteries presented a rather marked degree of arteriosclerotic change with narrowing and occlusion of some of the arteries. There was some congestion of the liver. The kidneys showed a severe congestion and the brain showed a slight congestion. It was said no other lesions of significance were found. The conclusions reached by Dr. Rosenthal were that the findings were consistent with acute myocardial failure associated with coronary sclerosis. The report also stated that "* * * the skin did not reveal any histological evidence (structural evidence) which would lead one to suspect that these lesions were due to an electric shock." It continued:

"* * * It is possible that the added strain of climbing up on a platform by Mr. Gustin to perform his work added sufficient strain upon his heart to precipitate an acute episode.

"There is no anatomical evidence that an electric shock was the cause of the immediate exodus of this subject."

In his testimony given at a hearing on October 13, 1953, Doctor Rosenthal stated it was his opinion Mr. Gustin suffered a heart attack while he was apparently on the platform and on sliding down he fell and bruised his chest. He testified that he thought it would be possible for an electric shock to precipitate a heart attack. He was asked if decedent received an electric shock and then fell to the floor (roof)

of the inventory box approximately four to five feet below the girder on which decedent was standing, if in his opinion it would precipitate an attack if his heart was in the condition as the heart he described in his autopsy, to which he replied:

"Yes, any excessive strain might precipitate a heart attack either emotional or physical.

"Q. Then it is your opinion that an electric shock or a fall that distance or heat while working in that kind of place could have precipitated a heart attack? A. Yes.

"Q. Did you make an examination of the hands of the deceased, Doctor? A. I believe I did, yes.

"Q. Do you recall what they appeared as? A. As I recall there weren't any marks of any significance.

"Q. Do you recall the color of the hands, the palms particularly? A. I don't have them in my notes, but apparently I wasn't impressed by any findings on the hands.

"Q. Would an electric shock, Doctor, necessarily leave any marks on the skin? A. No, not necessarily; they usually do.

"Q. And if after receiving an electric shock through the use of say an ordinary drill and voltage, if a person died within a few seconds thereafter, would there be, normally, any blistering or mark on the person where the electricity entered the body? A. There may or may not be, it depends on the resistence of the skin.

"Q. Then there is not a certainty that there would be or wouldn't be?" A. That is correct. * * *"

"Q. In your opinion could Mr. Gustin from the fall and the injury he suffered to his chest, could that fall and injury have precipitated his heart attack? A. Yes, I am afraid I would have to say any emotional stress or strain can precipitate a heart attack in an individual with a heart of this type."

He further testified that the voltage through a light socket in the wall of a house could induce the heart to have a sudden spasm. He said he thought any sudden shock, emotion, physical or electrical might precipitate a heart attack to a heart such as Mr. Gustin had.

Doctor Daniel J. Condon who performed the post mortem examination testified it was his opinion decedent died as a result of hypertensive arterio-sclerotic heart disease. He stated he couldn't establish any relationship between possible electric shock and the death. He observed three bruises over the back, one was of a purple blue appearance located on the left side of back roughly at the level of the 5th thoracic vertebra extending to the 7th thoracic vertebra originating at the midline and extending slightly to the left 7 x 4 centimeters in

size. (2.5 centimeters to the inch). Four centimeters to the right side of the middle line of the back was a similar bruise at the level of the fourth dorsal 1 x 5 centimeters; another on the right side of the back at the level of the 3rd dorsal 2.5 x 1 centimeters in size. He stated these bruises would be consistent with a fall of four or five feet. He said his examination did not indicate that the bruises were in any way related to the decedent's death or that it contributed to it. He was of the opinion that neither an electric shock of three to six seconds' duration, a fall of four to five feet to the top of the inventory box, nor excessive heat or all combined would have precipitated decedent's attack from which he died on June 11. He testified it was possible.

We believe this is an accurate summation of the medical testimony and constitutes a conflict in the medical evidence.

Counsel for the petitioner states that so far as the evidence is concerned there was no mishap, there was no slipping or falling or twisting or jerking, no disarrangement of any kind immediately prior to the time he cried out. The undisputed evidence is that Mr. Gustin stood on a girder some four to five feet above the top or roof of an inventory bread box where he had gone to bore holes through the ceiling above with an electric drill. The ceiling through which the holes were to be bored was apparently approximately five feet above the girder on which he stood. Gustin was approximately six feet in height. The electric drill used by Mr. Gustin was a ¼-inch drill.

Elmo Griffins employed by the bakery testified that he received a shock from this drill six months previously. Freeman Fair, employed in a different department from Gustin, testified that Gustin borrowed a ¼-inch drill from him on June 10 (the previous day) stating that their drill was out of order. The drill used by decedent at the time of the injury had been used by him and another employee during the forenoon.

At about four o'clock in the afternoon decedent told Mr. Alcorn, engineer in charge of mechanical maintenance by whom Gustin had been employed, that he was going to bore the holes in the ceiling and that he would have just about enough time to do it before quitting time. He said about 10 or 15 minutes later and not in excess of 20 minutes someone came into the office and stated that Gustin had fallen and stuck the drill through his body. He hurriedly went to his assistance and found him lying on top of the inventory bread box and that the drill had fallen to the floor below.

Robert James Boggio, another employee, stated that he heard decedent let out three "hollers" as if in pain. They were loud. He didn't know how far away he was from decedent at the time but he said that decedent was in the corner of the building and he was cater-cornered across from him in the wrapping department, a distance of about a fourth of the length of the build-

ing from decedent. He testified that his first thought was that someone had been caught in the bread conveyor and he turned that off immediately. He said he saw Gustin just as he started to fall from the girder. He didn't make any more noise. He said that immediately before Gustin fell he was more or less in a stiff position, that when he got to him the drill was between his legs and he unhooked the cord to the drill and pulled the drill out; that he didn't know what happened to it then; that the decedent was then breathing a little hard.

Homer Hunt and Frederick D. Henkin, employees of petitioner, testified they heard decedent scream. Mr. Henkin described the screams as terrifying. He also said he could see Gustin from where he was (at the drinking fountain); that decedent was up on the platform (girder) and it seemed he was trying to let go of the drill that he had in his hand. He couldn't tell which hand the drill was in. It seemed like he was struggling with it. He screamed three times. They were plenty loud, he said. Mr. Gustin then fell to the roof of the bread inventory box below. Mr. Alcorn who was an engineer and has been with petitioner for 26 years stated that every drill he had ever used shorted out sooner or later. The one in the garage gave him a terrible shock one day. He said they didn't throw these drills away unless they were past repair; that they were still using the ¼-inch drill. Two or three months previously he had more than one man tell him that they had received a shock from this particular drill.

Edward S. McDowell testified that both he and Gustin had been shocked by said drill two or three times each, previous to June 11. McDowell further stated that when they took decedent off the top of the bread box he was wet from head to foot and that it was very hot up where he was working. He stated that right after decedent had been taken down he took the drill to the shop and there is where "we examined it at that time." One of the wires, he said, was torn loose and one had been grounded to the handle and torn loose. This indicated the handle was charged with an electric current of sufficient voltage to melt a strand of copper wire. By "ground to the handle" he said he meant that where it came out it had arced to the handle of the drill and welded itself to the handle by the arcing. Part of the copper was still there stuck to the handle. Justice of the Peace, Al J. Flood, stated in his deposition that one of the loose wires had arced to the handle and fused a strand of the copper wire to it which he said was still there when he examined it.

McDowell further testified that he was working with Alcorn in the shop when they were informed that Gustin had fallen. He first saw Gustin lying on top of the box. He had four holes made ready to drill at the time; that it was hot up there, approximately 90 degrees; that he was requested by a Mr. W. H. Roberts to get up on the girder at the point where Gustin would have had to stand to bore the holes and he stated that

194

because of the distance from the girder to the ceiling he had to bend over considerably and in order to balance himself he had to hold to the water pipe running horizontally alongside where he stood which from the photographs in evidence appeared to be at a height of about halfway between his hips and his shoulder. He stated that he was only about 5 feet 9, and that decedent was more than 6 feet tall.

Frank E. Vinson of Carter & Vinson testified that the drill was brought to his place for repair and they repaired it. He stated that there was not too much wrong with it, that it didn't require a major repair job. He further stated that Gustin could have gotten a shock from the drill if one of the lead wires was touching the frame. That would ground one side of the motor. If Gustin at that time touched the pipe beside him he could have gotten a shock. He further stated the lead wires to this drill were made up of many little strands of copper wire and if anyone of these little strands was not under the screw connecting it with the drill and happened to be touching the frame or motor and he was standing on anything wet, damp floor or anything that "pertained to a ground" he would probably get a shock off of it the minute he pulled the switch on the drill. He further stated that he could get a shock through the pipe that ran horizontally alongside of him.

Mrs. Margaret Gustin, wife of decedent and claimant herein, testified that she went to the hospital when she heard of the accident and that Mr. Gustin had not been removed from the ambulance at the time she arrived. She said the perspiration was still standing all over him and she did not know that he was dead, that she noticed when she got in the ambulance that his hands were black on the inside and were not much larger than her hands and seemed cramped. She said he had unusually large hands. Mr. Hubert McCuiston, an employee of the petitioner, said that he had shared a ride with Gustin to Michigan and that as soon as he saw him his hands looked much smaller than they had looked before, that they were all drawn and the fingers were smaller and looked like the fingers of a man 70 years old. The undertaker in Ohio who prepared the body for burial wrote a letter in which he stated that the hands of decedent appeared to have been burned very badly at the time of death and stated that of course in this condition they would not embalm very well which, along with the time element that transpired from time of death until "we received the body would, in my opinion account for the dark color of the hands. This color was not due to grease and dirt."

It is our view that the testimony of Dr. Rosenthal plus the testimony of witnesses who were in the bakery at the time of the death of decedent together with the circumstances surrounding the case indicate that something did happen to decedent

which caused him to utter terrifying screams as if in pain three different times following which he appeared to be struggling with the drill. He had had some kind of an attack on two previous occasions because of being overheated and on neither of such occasions did he cry out or manifest any pain whatever but on the contrary appeared to be very weak, very pale and had to be helped to a place where he could rest. The fact that the drill had short-circuited, that it had shocked a number of the employees including the engineer Mr. Alcorn, and the fact that it was testified by Mr. Vinson that he could have received a shock from the drill upon placing his hand on the water pipe after he turned the switch on the drill connecting the current with it, and the further fact that one of the loose wires was conclusively shown to have grounded with the handle of the drill by a current sufficiently high to fuse or weld the copper wire to the handle and also that decedent's body was wet or damp with perspiration, we believe, furnishes ample evidence to warrant a finding that decedent was injured by accident arising out of and in the course of his employment and to justify the commission to award compensation to claimant. Under such circumstances we would not be justified in setting the award aside.

The award is therefore affirmed.

STANFORD, LA PRADE, UDALL and WINDES, JJ., concur.