303 P.2d 710

**Rufus T. CROSS, Petitioner,**

v.

**The INDUSTRIAL COMMISSION of Arizona and William E. Rauh, Respondents.**

No. 6218.

Supreme Court of Arizona.

Nov. 20, 1956.

Silver, Silver & Ettinger, Tucson, for petitioner.

John R. Franks, Phoenix, Donald J. Morgan, Robert K. Park and John F. Mills, Phoenix, of counsel, for respondent Industrial Commission.

WINDES, Justice.

Certiorari to the Industrial Commission of Arizona to test the validity of a final award of the commission denying compensation to Rufus T. Cross. Petitioner was employed by respondent William E. Rauh as janitor and dishwasher from September 20, 1954, to October 11, 1954. The evi-

dence indicates that during this period he bumped his head two or three times on a shelf over the sink. According to the employer's testimony, during this period of employment petitioner complained of having a cold in his eye. Upon termination of his services, he went to the hospital at Davis-Monthan Air Base. The doctor in charge of the hospital called in Dr. Sherwood P. Burr, Jr., an eye specialist, who examined petitioner. The commission having initially denied compensation, rehearing was granted at which Dr. Burr was sworn and testified. The initial award was affirmed.

A petition for second rehearing was filed for the purpose of submitting additional medical evidence through Dr. Jack Klein, an eye specialist. This petition was granted and the commission appointed a board of medical examiners consisting of Drs. Paul E. McFarland, John S. Aiello and H. F. French for the purpose of examining petitioner and reporting to the commission. Dr. Klein testified at the second rehearing. The board of examiners filed its report and no request was made for their oral testimony. After hearing the testimony of Dr. Klein and receiving the report of the board of examiners, the commission again affirmed the previous findings and award to the effect that petitioner had a detached retina of the left eye which was not causally related to or contributed to by any alleged personal injury by accident arising out of and in the course of his employment and denied compensation.

The evidence fairly shows that petitioner bumped his head during the course of his employment and that thereafter it was discovered that he was suffering from a detached retina and blindness in his left eye. Whether there is a causal relationship between the accident and the detached retina is a question that must be answered by the expert medical evidence. Petitioner contends that this evidence without contradiction shows that the accident caused or contributed to the detached retina and the resulting blindness in his left eye and the commission, therefore, is required to allow compensation.

Dr. Burr testified extensively. We believe from reading his entire testimony that he never testified that in his opinion the accident caused or contributed to the injury. His final testimony was as follows:

"Q. Doctor, assume that a patient comes to you and tells you that during a three week period he has bumped his head five or six times, and that approximately three weeks after bumping his head for the initial time, he developed running eyes, painful eyes, but that he does not notice any loss of vision until told that he had a loss of vision by you as the doctor that examined him. Would you say that during that three week period of time that

he was bumping his head, that he did not have a loss of vision, or would you say that from that history in all probability he was suffering from a loss of vision throughout that total period? A. I can only answer that by saying it is quite possible he had no vision in the eye all that time and didn't honestly know it. It is just as possible that his vision started to disappear after the first blow. I mean, we are theorizing on something I am in no position to answer. I can come along with this, which I have said before. The extent of the detachment that he had at the time I saw him, the extent of the detachment, by that I mean he had a massive detachment, and the amount of pain and discomfort he had, from a medical standpoint would imply he had the detachment quite some time. That is about the only thing I can say, and even that isn't foolproof.

"Q. By quite some time, what do you mean? A. He could have had it several months before he. bumped his head working in the bakery. That is a possibility. I have only said that the pain he had and the extent of the detachment would imply. That is all."

He also stated that with a predisposition to retinal detachment the bump could possibly cause it; that the bump could possibly cause it without predisposition; that it was possible that he would have had the detachment without a bump, i. e., it could have been spontaneous, and that it is possible he had the detachment before his employment. The doctor then testified:

"Q. You, therefore, have four or five different possibilities? A. That is right. That is a fair way to approach the situation, and as I say it is too bad that you might say that I wasn't originally responsible for him."

Dr. Klein testified at length. We believe a fair statement of his final conclusion is as follows:

"Q. From the medical information you have gained through your personal examinations coupled with the reports to which I have just referred you, and given the history as you understand it, that being Mr. Cross bumped his head twice on September 20 and approximately twice after that during an approximate three week period, that he experienced pain on the left side of his head on September 20th, but that his first complaints of actual eye trouble, that being pain in the eye and watering commencing approximately three weeks after the blow, and the fact that a massive retinal detachment was diagnosed approximately October 15th, coupled with his medical history, would you say or would you be in any position to express an opinion as to the causal relation between the blows and the detached retina? A. I would

have to be very indefinite about any opinion I might have except to go over some of the things we have said in the hearing. That because of his age, over fifty, because of the presence of a slight amount of hypertension, and because of a two plus blood, the cause of which we do not know, that a blow on the head could have aggravated or caused or been inducive of a retinal detachment which might not have been noticed by the patient for a period of time, and which upon becoming more severe caused complete blindness in the eye concerned. Or it might have aggravated conditions which were there prior to the blow, which resulted in a retinal detachment, or even, to be fair, there may be no relationship whatsoever; because I have never had the privilege of having examined the eye previous, but by conjecture I think any one of those three things could have happened; that there was no relationship between the blow and the retinal detachment, that there was a relationship between the blow and the detachment because of prior anatomical physiological conditions in the eye due to hypertension, arthritis, two plus blood, et cetera, or there might have been a direct relationship between the two."

The board of medical examiners in its report stated:

"The injury Mr. Cross alleges to have sustained is an indirect injury to the eyeball. This type of injury acts, not as the primary cause of a detachment but merely as the precipitating agent in an eye already prone to detachment. This seems to be true in his case as, when first seen by Dr. Burr he had a full blown case of generalized uveitis associated with a detachment. Then too, we have to reckon with his plus 2 blood which might contribute to his ocular pathology.

"His symptoms after the alleged injury are atypical of traumatic retinal detachment, but are typical of uveitis (or iritis), tearing, burning, etc. Retinal detachment from a blow gives us a quiet eye with fogging or clouding of the visual field in one quadrant.

"Conclusion: Mr. Cross cannot pinpoint an injury as the one blow which produced his detachment, but we have found enough evidence of ocular pathology in his eye which surmounts the etiology of trauma. Therefore, it is our opinion that the detachment of his left eye is non-traumatic."

It appears from the foregoing that according to the medical evidence causal connection was a possibility but there was also a possibility that the accident did not cause or contribute to his injury. We do not feel that under this state of the record, we would be justified in saying

**226**

that the evidence was such as compelled the commission to adopt one of several possibilities and thereby require the commission to decide that the petitioner has by uncontradicted evidence proven that the injury was caused or contributed to by the accident.

Award affirmed.

LA PRADE, C. J., and UDALL, PHELPS, and STRUCKMEYER, Jr., JJ., concurring.