420 P.2d 194

**KENNECOTT COPPER CORPORATION, Petitioner,**

**v.**

**The INDUSTRIAL COMMISSION of Arizona, and A. R. Kleindienst, C. Lawrence Huerta and Frank C. Murphy, as members of The Industrial Commission of Arizona, and Martina Elizabeth Hooker, Respondents.**

**No. 1 CA–IC 75.**

Court of Appeals of Arizona.

Nov. 18, 1966.

Fennemore, Craig, Allen & McClennen, by Roger G. Strand, Phoenix, for petitioner.

Leonard P. Kincade, Terre Haute, Ind., Kenneth S. Scoville, by LeRoy W. Hofmann, Phoenix, for respondents.

Robert K. Park, Chief Counsel, by Joyce Volts, Phoenix, for respondent Industrial Commission.

DONOFRIO, Judge.

This case comes to this Court on a writ of certiorari petitioned by Kennecott Copper Corporation to review the lawfulness of an award of the Industrial Commission granting compensation, burial expenses, funeral expenses, and death benefits to a widow (Mrs. Hooker) and five minor children.

Harold R. Hooker began employment as a boilermaker at Kennecott Copper Corporation in February of 1964. An x-ray taken at the time of employment showed an aneurysm of the thoracic aorta.

Sunday, June 28, 1964, Mr. Hooker did not work. On Monday, June 29, he went to work at 7:30 a. m. In the early afternoon Mr. Hooker complained to his foreman that while picking up a ¾ inch metal plate he had pulled something in his back. The foreman immediately sent Mr. Hooker to the company clinic where he was examin-

ed by Dr. Linsley and treated for a back pain. He then returned to work. That evening while driving to Willcox, Mr. Hooker and his wife stopped at Safford for gas. He was struck by a sudden pain in his chest and was unable to get his breath. He was immediately taken to the Safford Hospital where he was attended by Dr. F. W. Knight. Dr. Knight examined Mr. Hooker and took a history. The doctor in his testimony at the hearing could not recall whether he had taken the critical portion of the history from Mr. Hooker or from Mrs. Hooker. However, in a letter of August 1, 1964, to the Industrial Commission Dr. Knight made the following statement:

"On arriving at the hospital I found this 39 year old man in a condition of shock, although he was able to converse with me in a labored manner. He told me he had been well until yesterday (28th of June) when he suddenly developed severe lower chest pains. I did not ascertain at that time what he had been doing on the 28th. He did state that he had worked on the 29th but the pain got so severe that he had not been able to do hard work, which I specifically asked him. I was specific in this question because his present state showed him sweating, cyanotic and he had been vomiting in the hospital."

Mr. Hooker was kept at the Safford Hospital until July 3. He was then moved to the Kearney Hospital. On July 11 Mr. Hooker was taken by ambulance to St. Luke's Hospital, Phoenix. There his condition was diagnosed as a perforating aneurysm of the distal thoracic aorta. This was surgically repaired on July 17. Mr. Hooker was kept at St. Luke's until August 23 when he was again moved to the Kearney Hospital from which he was discharged on August 28. On the evening of September 10 he was readmitted to the Kearney Hospital suffering severe chest pains. On September 12 he was moved by ambulance to St. Luke's where he was taken to surgery September 13. During surgery Mr. Hooker went into cardiac arrest. After

many attempts were unsuccessfully made to revive him he was pronounced dead.

The petitioner-employer, in seeking to set aside the award, contends the industrial episode of June 29 could not have been the cause or contributing cause of Mr. Hooker's death since the sole cause, the rupture of the aneurysm, occurred on Sunday, June 28, a nonworking day. This is based principally on Dr. Knight's statement in the letter of August 1, 1964.

The issue then is whether Dr. Knight's history of the decedent showing that pain started on Sunday, the 28th, is uncontroverted fact which must be taken to show that the rupture of the aneurysm began on a nonworking day, which rupture was the cause of death.

A second question is whether work by Mr. Hooker on Monday, the 29th, contributed to the condition which caused his death.

■ The testimony of Dr. Knight stating what was said to him when he was taking a history is hearsay. The widow was not present in person or by attorney at the hearing at which Dr. Knight testified. No objection was made to his testimony concerning the history and that testimony was allowed to come in. Neither did Mrs. Hooker make objection to the inclusion in the file of the Industrial Commission of Dr. Knight's letter, so both pieces of evidence are properly in the record for our consideration.

■■ Although the hearsay rule is relaxed in compensation cases, the Commission has the duty to ascertain the truth by what they consider reliable evidence. When hearsay is before them they may give it such probative value as they deem it merits, being free to disregard that which they deem unreliable. Gomez v. Industrial Commission, 72 Ariz. 265, 233 P.2d 827 (1951); see also Altman v. Pace, 49 Ariz. 231, 65 P.2d 1164 (1937); Young v. Hodgman & Mac Vicar, 42 Ariz. 370, 26 P.2d 355 (1933); Kelsey v. Industrial Commission, 79 Ariz. 191, 286 P.2d 195 (1955).

We are unable to know what weight was given Dr. Knight's testimony but, for example, the Commission could well have doubted its trustworthiness, Gomez, supra, by concluding that the doctor took the history to aid himself in diagnosis rather than to take down an accurate statement for use in evidence. Also, there was some question on whether Mr. or Mrs. Hooker, or both, gave the history to Dr. Knight. The doctor could not remember. His memory on this point is some consideration in determining the forcefulness of his memory of what was said.

At the hearing Mrs. Hooker testified that Mr. Hooker had complained of no pain on Sunday and that she and Mr. Hooker had spent the day together, going on a picnic in the afternoon. This alone would present a conflict in evidence for the Commission to weigh.

█ The petitioner, Kennecott, urges that the history taken by Dr. Knight was in the nature of a dying declaration and therefore was highly probative to the point that it would be allowed in evidence as an exception to the hearsay rule. That exception requires that the person making the statement must know that he is dying, he must actually die, and the application of the rule has been limited to homicide cases. Udall, Arizona Law of Evidence, § 176. Reasons for the rule are: a person who is dying has no reason to speak an untruth; there is necessity since one who is dead can no longer testify, and in the case of homicide the public has a great interest in seeing the guilty punished or the innocent released.

█ We do not pass upon whether the exception is applicable to civil cases, however there is no evidence to show that Mr. Hooker knew that death was impending. He did not die until two and one-half months later. In any event it would be essential to show that declarant was sufficiently in possession of his mental faculties to realize what he was saying and that his mind was clear and rational. The

Commission was free to find that a man who was in shock and cyanotic was not in that condition.

Furthermore, Dr. Melick who attended Mr. Hooker at St. Luke's also took a history. He testified there was no mention of chest pains on the 28th. The Commission was free to put as much or more credence in that history taken just prior to surgery than in Dr. Knight's history.

Dr. Linsley saw Mr. Hooker when Mr. Hooker went to the clinic from work on the 29th and later when Mr. Hooker was hospitalized in Kearney. The doctor testified:

REFEREE:

"Q. Did he report any pains on the 28th?

"A. Not to me.

"Q. Not to you?

"A. Not to my knowledge to the medical staff up there. There would have been a record somewhere."

█ The testimony of Dr. Knight was not uncontroverted fact, but was only one of several pieces of evidence for the Commission to consider.

█ For this Court to dictate that the Industrial Commission must find a fact, the evidence must be such that there is but one possible inference to be drawn therefrom. Gronowski v. Industrial Commission, 81 Ariz. 363, 306 P.2d 285 (1957); Thiel v. Industrial Commission, 1 Ariz.App. 445, 404 P.2d 711 (1965).

█ The second issue is to determine whether there was any evidence to sustain the Commission's finding that "the exertion of the decedent's employment precipitated the rupture of the aneurysm, materially contributing to and accelerating the inevitable death of the decedent as a consequence thereto". An injury or death does not become noncompensable merely because a preexisting disease or condition of the employee has been a contributing factor thereto. Revles v. Industrial Commission, 88 Ariz. 67, 352 P.2d 759 (1960).

In Thiel v. Industrial Commission, supra, this Court quoted the Supreme Court of Arizona on causation:

"Where a worker died from a heart attack, if his activity on the job precipitated the heart attack, or accelerated death, the petitioner meets the burden of proving the causal connection between his employment and the decedent's death. In Revles v. Industrial Commission, 88 Ariz. 67, 352 P.2d 759, this court held:

'Second, an industrial injury need not be the *sole* cause of death, in order to entitle decedent's dependents to death benefits, as long as it appears that the injury contributed to and accelerated the inevitable.' Russell v. Industrial Commission, 98 Ariz. 138, 402 P.2d 561 at 564 (1965)."

Petitioner also relies upon testimony of Doctors Melick and Cohen to the effect that if the pains and rupture of the aneurysm occurred on June 28 the alleged lifting incident of the 29th had little to do with Mr. Hooker's terminal picture. The questions posed to these experts assume that Mr. Hooker experienced chest pains on the 28th. For the reasons heretofore given, the conclusions based on this hypothesis need not be considered by the Commission. One doctor, called as an expert at the hearings, testified that the back pain experienced at work was entirely consistent with pain which would begin at the rupture of the aneurysm and that back pain would be a symptom.

■ We find there were sufficient other facts on which a finding of causal relation could be based. The testimony of the foreman was that the decedent reported the pain as a result of efforts on the job. Dr. Linsley at the clinic received the same story. Dr. Melick's testimony of the history taken at St. Luke's is also consistent.

Dr. Melick, in a letter accompanying an Initial Report of Attending Physician dated July 21, 1964, made the following statement:

"March 1964 films revealed the aneurysm. The physical effort of June 29, 1964, resulted in an acute rupture of the aneurysm with massive hemorrhage in the right plural space. It therefore appeared he is an industrial responsibility on the basis of the aggravation of a pre-existing condition."

Our duty is to affirm the Commission's findings if they are reasonably supported by the evidence. Russell v. Industrial Commission, 98 Ariz. 138, 402 P.2d 561 (1965).

The award is reasonably supported by the evidence.

Affirmed.

STEVENS, C. J., and CAMERON, J., concur.